Filed 12/5/14  P. v. Dean CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LAWRENCE LEE DEAN, JR.,<br><br>Defendant and Appellant. | F064134<br><br>(Super. Ct. No. BF126004E)<br><br>**OPINION** |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALERIC McDONALD,<br><br>Defendant and Appellant. | F064175<br><br>(Super. Ct. No. BF126004A) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCUS JOEL JOHNSON,<br><br>Defendant and Appellant. | F064299<br><br>(Super. Ct. No. BF126004C) |

APPEAL from judgments of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant Lawrence Lee Dean, Jr.

Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant Aleric McDonald.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant Marcus Joel Johnson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Lawrence Dean, Marcus Johnson, and Aleric McDonald were tried together on charges of criminal conspiracy and first degree murder in connection with a gang-related shooting that occurred in Kern County.  Johnson and McDonald were prosecuted as adults despite being under the age of 18 at the time of the incident.  A jury found the defendants not guilty as charged, but convicted them of second degree murder as a lesser included offense and also returned true findings on enhancement allegations for gang participation and use of a firearm.  Each defendant was sentenced to an aggregate term of 40 years to life in prison with the possibility of parole.  We have consolidated their separately filed appeals.

Dean alleges instructional error by the trial court and also contends that a confession he gave at the time of his arrest was involuntary, and therefore inadmissible at trial.  Johnson's claims are based on allegations of judicial and prosecutorial misconduct, insufficiency of the evidence, and ineffective assistance of counsel.  Johnson further asserts that the trial court violated his constitutional rights by denying his motions for self-representation and by requiring him to wear leg restraints during portions of the trial.

McDonald alleges instructional error, judicial/prosecutorial misconduct, and error in the admission of certain opinion testimony by a gang expert during the prosecution's case-in-chief. McDonald also claims that because of his young age at the time of the offense, his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

Appellants join in each other's claims to the extent those arguments are applicable and beneficial to their individual positions. They are unanimous in their assertion that the cumulative effect of errors in the proceedings below violated their rights to due process and a fair trial. Finding no cause for reversal, we affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of November 22, 2008, officers from the Bakersfield Police Department responded to reports of a shooting at the Emerald Glen apartments in the vicinity of 1200 38th Street, a large residential complex also known as the Willows. Upon their arrival, police found David Camberos lying motionless on the ground and bleeding from a single gunshot wound to the chest. Mr. Camberos died from his injuries. Eyewitnesses informed police that a group of African-American males were involved in the shooting and had fled the scene in a van.

A crime scene technician recovered two spent .22-caliber shell casings and one spent nine-millimeter shell casing from the area where shots had been fired. In addition to the casings, a .22-caliber bullet and a nine-millimeter bullet were found lodged in the walls of nearby apartment buildings. A second .22-caliber bullet was recovered from the victim's body during an autopsy.

On December 11, 2008, Kern County probation officers contacted 15-year-old Aleric McDonald at his mother's residence to conduct a probation compliance check. A search of his person uncovered a .22-caliber handgun in the front pocket of his clothing. The officers also found a nine-millimeter handgun underneath a couch cushion where a

boy named Chad Scott had been sitting when they arrived. McDonald was arrested and taken into custody for unlawful possession of a firearm.

Within days of McDonald's arrest, detectives from the Bakersfield Police Department received information from a third party source which helped them to develop six suspects in the shooting death of David Camberos. Following up on the tip, detectives interviewed Lawrence Dean, Marcus Johnson, Justin McCowan, Aleric McDonald, Chad Scott, and Charles Scott. At least four of the six suspects told investigators that McDonald discharged a firearm during the incident at the Willows on November 22, 2008. Dean specified that McDonald had used a .22-caliber pistol to shoot the victim, and confessed that he had personally fired a nine-millimeter handgun into the air before fleeing with the others in a van. The nine-millimeter handgun was allegedly given to him by Johnson moments before the incident occurred. Statements made by Dean and others during the interview process suggested that the shooting was motivated by gang rivalry, though the victim had apparently been selected at random.

On December 18, 2008, the Kern County District Attorney filed a criminal complaint alleging counts of premeditated first degree murder (Pen. Code, §§ 187, subd. (a); 189) and conspiracy to commit murder and assault with a firearm (Pen. Code, §§ 182, subd. (a)(1); 187, subd. (1); 245, subd. (a)(2)) against Dean, Johnson, McDonald, Chad Scott, and Charles Scott.[1] Subsequent to the filing of this complaint, brothers Chad Scott and Charles Scott accepted a plea bargain offered to them in exchange for their testimony against the other people involved in the shooting. By the terms of the agreement, since both were under the age of majority, they were punished as juveniles and committed to the California Youth Authority (now the Division of Juvenile Justice) until their 25th birthdays.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

On April 3, 2009, defendants Dean, Johnson, and McDonald were charged by information with conspiracy to commit murder and assault with a firearm (Count 1), and premeditated first degree murder (Count 2). Enhancement allegations were attached to each count for furthering the activities of a criminal street gang (§§ 186.22, subd. (b)(1); 190.2. subd. (a)(22)), personal and intentional discharge of a firearm with proximate causation of death (§ 12022.53, subd. (d)), and vicarious liability for such use of a firearm by a principal to the offense (§ 12022.53, subds. (d), (e)(1)). Johnson and McDonald were charged as adults pursuant to Welfare and Institutions Code section 707, subdivisions (d)(1) and (d)(2)(B), respectively.[2]

The April 2009 information also charged Justin McCowan with the same counts and enhancements. McCowan ultimately accepted a plea deal, the terms of which are not specified in the record. The charges against the remaining defendants were tried before a jury in April, May, and June 2011.

Prosecution Case

Percipient witnesses included Shawndel Ziegler, Paul Torrealba, and Darlene Graham. Mr. Ziegler, a close friend of David Camberos, and was with the victim at the Willows on the night of his death. They had been conversing with a group of friends in a common area of the apartment complex immediately prior to the shooting. Mr. Ziegler last saw his friend alive as the victim was walking in the direction of his home. He heard gunshots approximately one minute later.

Police interviewed Mr. Ziegler within 24 hours of the shooting, but at trial he denied being able to recall most of what he had said during the interview. The prosecution's evidence showed that Mr. Ziegler had reported seeing four or five African-

---

[2] According to the record, McDonald's age at the time of the offense was 15 years and six months. Johnson's age was 17 years and 10 months. Dean turned 18 years old approximately three weeks prior to the shooting.

American teenagers walking through the Willows shortly before the victim was shot. All of them had short hair except for one individual who wore a "big afro" pulled back in a ponytail.

Paul Torrealba was parked outside of the Willows at the time of the incident, waiting to give a ride to a friend who lived in the complex. While seated inside of his vehicle, Mr. Torrealba observed a group of approximately four African-American males approach a Hispanic male, then saw one of the African-American males fire a gun at the Hispanic person.[3] The gunshot victim tried to run away, but soon collapsed to the ground. Meanwhile, the shooter and his companions ran into the street, passed in front of Mr. Torrealba's car, and drove away in a van. It appeared to Mr. Torrealba that an additional person had been waiting for the perpetrators inside of the van.

Darlene Graham, a resident of the Willows, testified to hearing gunshots on the night in question. After exiting her apartment to see what was happening, she saw a young man who appeared to be holding a firearm. Ms. Graham asked him if it was a real gun. He replied "yeah," pointed it at her, and then took off running. Based on his confession to police, the prosecution alleged that the individual she had spoken to was Lawrence Dean. Following her brief encounter with this person, Ms. Graham saw him and five other people running out of the apartment complex towards 38th Street.

Various personnel of the Bakersfield Police Department provided testimony regarding the bullets and shell casings found at the crime scene. The probation officers involved in the search of Aleric McDonald's residence testified in regards to their seizure of the .22-caliber and nine-millimeter caliber handguns. Once the foundational requirements for this evidence were established, the prosecution presented testimony from Dianna Matthias, a firearms examiner and criminalist for the Kern County Regional Criminalistics Laboratory. Based on a comparative analysis of the crime scene evidence

---

[3] Shawndel Ziegler testified that David Camberos was of Hispanic ethnicity.

6.

and ammunition test-fired from the seized weapons, Ms. Matthias was able to determine that the .22-caliber bullet recovered from inside the victim's body had been fired from the .22-caliber pistol found in McDonald's pocket at the time of his arrest. The bullets found in the walls of the apartment buildings were too deformed to allow for a side-by-side comparison of rifling markings and other characteristics. However, testing confirmed that all three shell casings had been ejected from the handguns that were retrieved from McDonald's home.

In light of defense objections made pursuant to the *Aranda*/*Bruton*[4] rule, Dean's videotaped confession was not shown to the jury. Instead, Detective William McNeal of the Bakersfield Police Department testified to certain statements the defendant made to him over the course of two custodial interviews. Dean admitted being present at the time of the shooting and firing a nine-millimeter handgun into the air at a particular location inside of the apartment complex. Dean also admitted that he had a brief exchange with an adult female (i.e., Darlene Graham) as he was leaving the crime scene.

Accomplice testimony was provided by Chad Scott, Charles Scott, and Justin McCowan. McCowan was the least cooperative witness of the three, but by putting him on the stand the prosecution was able to establish that he had previously admitted to being present at the Willows with Dean, Johnson, and McDonald when the shooting occurred. McCowan had also previously identified McDonald as the gunman.

---

[4] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). "The *Aranda*/*Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant…. '"*Aranda* and *Bruton* stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given."'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 869, citations omitted.)

7.

Charles Scott's testimony explained how the incident unfolded and also touched upon the defendants' gang ties. He identified himself as a former member of a Bakersfield gang called the Westside Crips, and more specifically, the Sixth Street subset of that gang. Known by his street name, "Lil' Rag," he was active in the gang at the time of the shooting. To his knowledge, Dean ("CT"), Johnson ("Lil' M-Locc") and McDonald ("Baby M-Locc") were also members of the Westside Crips.

In Charles Scott's version of events, the night began with him hanging out at his house with his brother, Chad, and a group of people consisting of Dean, Johnson, McDonald, McCowan ("J-Swift"), and someone named Malik Bowman. Hoping to find a better way to spend their evening, the group asked Chad and Charles' mother, Doreen Montiel, if they could borrow her van. Ms. Montiel initially refused the request because neither of her sons had a driver's license. Charles was persistent, and she eventually agreed to let him use the van on the condition that it was operated by Johnson, since he was supposedly a licensed driver.

With Johnson behind the wheel, the group spent approximately two or three hours cruising around Bakersfield searching for parties before returning to the Scott's home to drop off Malik Bowman. After they had parted ways with Mr. Bowman, Johnson received a call on his cell phone. When the call ended, he informed the group that there were some "Eastsiders" at the Willows, and then proceeded to drive to that location. According to Charles Scott's testimony, Johnson's statement was made in reference to the Eastside Crips, a gang with whom the Westside Crips had an ongoing and violent rivalry.

Johnson parked the van on a street corner near the Willows apartment complex. Prior to exiting the vehicle, Johnson told his companions, "The first Eastsider we see, shoot." Both he and McDonald had handguns in their laps while they were inside of the van, and later transferred them into their waistbands before walking into the complex. McDonald's weapon was a .22-caliber pistol, and Johnson's a nine-millimeter handgun.

8.

Charles stayed in the van while the rest of his crew roamed the apartment complex. He soon saw McDonald fire his gun approximately three to five times, but could not discern at whom, or at what, he was shooting. A louder blast followed the first series of shots, but at that point Charles could no longer see who was firing. McDonald was still carrying a gun when the group arrived back at the van. The other firearm, however, was now in Lawrence Dean's possession.

Despite some discrepancies, Chad Scott's trial testimony was similar to that of his brother in terms of identifying McDonald as the shooter and Johnson as the person who drove them to the Willows. Johnson and McDonald were the only people whom he saw with guns that evening. The entire incident, from arrival to departure, was estimated to have occurred within a matter of minutes.

Chad Scott claimed active membership in the Westside Crips. He joined the gang when he was 12 years old and went by the nickname "Lil' Yak" (derived from the word "maniac" and conferred upon him by someone named "Big Yac"). He had known the three defendants for several years, and testified that each was a member of the Westside Crips. Johnson and McDonald were allegedly part of a subset known as "Family," while Dean belonged to the "Carnation Tract" subset. Chad also acknowledged that he sometimes wore his hair in a ponytail, and had likely done so on the night of the shooting.

Doreen Montiel was called to testify about the defendants' use of her automobile. The request to borrow the van was collectively made by her sons and a group of their friends. The group consisted of approximately seven or eight people, but besides Chad and Charles, she could only remember talking to a boy named Eric (Aleric McDonald) and a person she knew as "M-Locc." Although M-Locc visited her home on a daily basis, Ms. Montiel did not know his real name. She made a courtroom identification which confirmed that M-Locc was Marcus Johnson.

Ms. Montiel denied being able to recall the specific person to whom she had lent the vehicle. Through further questioning on direct and cross-examination, it was established that she had previously testified to giving her car keys to Johnson. Her prior testimony was given at a preliminary hearing held in March 2009, approximately four months after the shooting.

To further corroborate the Scott brothers' version of events, the prosecution presented testimony from an investigator named Jason Furnish. Mr. Furnish specialized in wiretapping and cell phone data analysis, and had reviewed the cell phone records of Johnson and the Scott brothers to determine their respective movements on the night of the shooting. This was accomplished using mapping software and other computer programs designed to approximate the geographic location of each individual based on data obtained from the cellular antenna towers that received signals from their phones while the devices were in use.

The shooting was believed to have occurred shortly before 10:40 p.m., when police first received reports of the incident. Mr. Furnish's analysis focused on the activity of the three target phones between 9:35 p.m. and 11:08 p.m. Using maps and other visual aids, the witness explained how Chad Scott's phone activity from 9:35 p.m. through the time of the shooting revealed a pattern of movement from the southwest side of Bakersfield up to the northern part of town in the vicinity of the Willows. Johnson's phone showed three calls during this time period, all from locations south of the Willows, with the last call registering at 10:14 p.m. Johnson's phone was switched off from approximately 10:15 p.m. until sometime around 12:15 a.m.

The prosecution theorized that Johnson's last call at 10:14 p.m. was the same communication referenced in Charles Scott's testimony, i.e., the call which led Johnson to inform the group that there were "Eastsiders" at the Willows. This call also allegedly prompted the group's northbound movement towards the crime scene. Chad Scott's

phone subsequently registered activity near the Willows at 10:27 p.m. Charles Scott's phone was shown to be at or near the same location at 10:33 p.m.

Officer Pete Beagley testified as the prosecution's gang expert. He explained that the Westside Crips and Eastside Crips are rival street gangs in Bakersfield, both of which engage in an ongoing pattern of criminal activity and violence against one another. The expert also recounted his prior contacts with the defendants, as well as with Justin McCowan and the Scott brothers. Johnson and McDonald had admitted their affiliation with the Westside Crips during one of these encounters. Johnson also displayed numerous tattoos indicative of membership in the "Family" subset of the gang.

Among other topics of discussion, Officer Beagley's testimony provided an explanation for the similarity between the monikers used by Johnson and McDonald. He described a seniority system within the gang under which senior members act as something akin to a sponsor or mentor to younger members. If a senior member brings a recruit into the gang, or otherwise vouches for a junior member, the latter person may adopt a variant of the former's nickname or moniker. Use of the word "Lil" in one's moniker typically denotes such a relationship to a senior member. Charles Scott's testimony provided the same explanation for this nomenclature, adding that the word "baby" is essentially indicative of a third generation connection. One could thus infer the existence of a mentor/mentee relationship between Johnson ("Lil' M-Locc") and McDonald ("Baby M-Locc"). The word "locc" was defined by Officer Beagley as meaning "crazy or willing to do crazy things."

Officer Beagley's testimony was supplemented by that of several officers who had worked in the gang unit of the Bakersfield Police Department. These witnesses described the nature and extent of their prior encounters with Dean, Johnson, McDonald, McCowan, and the Scott brothers. Based on his own knowledge and experiences, as well as the testimony of his colleagues, Officer Beagley was of the opinion that the six people

11.

involved in David Camberos' death were all members of the Westside Crips at the time of the shooting.

Defense Case

The defense disputed witness Paul Torrealba's ability to see the shooting based on a statement he had made to police about another car being parked near his vehicle at the time. Further criticisms were made in regards to the fact that a gunshot residue analysis was not performed on the victim's body. Aside from arguing these two points, defense counsel focused their efforts on trying to discredit the Scott brothers and refuting the allegation that the shooting was intentional and/or gang-related. Arguments concerning the allegedly unintentional nature of the homicide were based on statements made by Chad and Charles Scott which indicated that McDonald seemed startled or scared when David Camberos suddenly appeared in front of him after turning the corner of one of the apartment buildings.

A private investigator named Harlan Hunter testified as the defendants' gang expert. Mr. Hunter disagreed with several of Officer Beagley's conclusions, and noted there was a lack of evidence to suggest that the victim was a gang member. In Mr. Hunter's opinion, the shooting happened by accident and was not gang-related.

Verdict and Sentencing

Defendants were acquitted on the charges of conspiracy and first degree murder as alleged in Counts 1 and 2. Each was convicted of second degree murder as a lesser included offense under Count 2. The jury returned a true finding on the enhancement allegation against McDonald pursuant to section 12022.53, subdivision (d), thereby concluding that he personally and intentionally discharged a firearm, and in doing so proximately caused great bodily injury or death. The vicarious liability enhancements alleged against Dean and Johnson pursuant to section 12022.53, subdivisions (d) and (e)(1), were also found true. In addition, each defendant was found to have committed the underlying offense for the benefit of, at the direction of, or in association with a

12.

criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

The jury returned its verdict on June 8, 2011. Sentencing was delayed until December 2011 due to requests by defense counsel for additional time to investigate purported allegations of juror misconduct. Defendants also filed motions for a new trial, which were denied at the time of sentencing. The claims of juror misconduct were never substantiated.

On December 20, 2011, defendants were sentenced to terms of 15 years to life in prison for their convictions under Count 2, plus consecutive terms of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1). Further enhancements imposed pursuant to section 186.22, subdivision (b)(1) were stayed. Each defendant filed a timely notice of appeal.

## DISCUSSION

**Denial of Johnson's Motion for Self-Representation**

Johnson alleges that the trial court violated his constitutional right to self-representation as recognized by the United State Supreme Court in *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). He further contends that the alleged error requires reversal of his conviction. We are not persuaded by his arguments.

Background

Attorney Charles Soria became Johnson's court-appointed legal counsel in December 2008. Trial proceedings commenced approximately 27 months later on April 4, 2011. During the time between January 9, 2009 and January 26, 2010, inclusive, Johnson made four requests for substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). These motions were denied.

A fifth *Marsden* hearing was held on the first day of trial after Johnson submitted a letter to the court expressing his dissatisfaction with Mr. Soria's representation. The letter stated, in pertinent part: "I feel that I, with no education or knowledge of [the] law,

13.

can do a better job in representing my own case. So if I cannot be appointed a new lawyer, I would like to represent myself." In light of these statements, the trial court treated Johnson's letter as constituting both a *Marsden* motion and a *Faretta* motion.

The record on appeal contains a sealed transcript of an in camera hearing which was held to address both of Johnson's requests. After confirming the defendant was alternatively seeking to represent himself, the court said, "Let's take up the *Marsden* motion first." The transcript discloses no further discussions regarding the *Faretta* motion, and concludes with the trial court addressing Johnson as follows: "Based on what I've heard and my knowledge of the case, it appears to me that Mr. Soria, who has been in this courtroom many, many times before, is providing you, sir, with adequate representation, and I find that there is no irreconcilable conflict in your relationship or any breakdown that would likely result in ineffective representation of your case, and based on those findings I'm going to respectfully deny your motion to remove Mr. Soria from representing you."

The last page of the sealed transcript contains a notation by the court reporter indicating that "proceedings continued in camera" before all of the parties reconvened in open court. When trial resumed, the judge informed the litigants, "I have respectfully denied the *Marsden* and *Faretta* motions." The corresponding minute order states, in relevant part: "The Court finds defendant's *Faretta* motion is untimely, therefore said motion is denied." Given these facts and circumstances, it may be possible that additional proceedings regarding the *Faretta* motion took place but were not reported, though the record is inconclusive on this point.

On April 29, 2011, the trial court held another in camera hearing to evaluate a sixth *Marsden* motion made by Johnson in relation to Mr. Soria's performance during jury voir dire and motions in limine. During this hearing, the following exchange took place between Johnson and the trial court:

14.

Johnson: I know Mr. Soria is not a good representation for me.  And I will not proceed on letting him represent me.  I would rather represent myself, I don't care what happens, for the simple fact him representing me is just like me representing myself.  He know the law; so I don't –

Court: Go ahead, sir.

Johnson: I don't understand why – I seen other lawyers, as far as Dean's lawyers, relieve their self for – because – it's nothing personal with me and Mr. Soria.  It's just the things that – I have been having him for two years.  The things that just been going on – you know what I'm saying?  We just barely now –

Court: I don't know what you are saying.

Johnson: Because I can't….I can't explain it right now because I'm angry.

Johnson argues that his statements at the sixth *Marsden* hearing amounted to a second *Faretta* motion.  In this instance, however, the trial court did not interpret Johnson's comments as an unequivocal request for self-representation.  The *Marsden* motion was denied and Mr. Soria continued to represent Johnson through the time of sentencing.

Analysis

The Sixth Amendment to the United States Constitution implicitly provides a right to self-representation in criminal proceedings.  (*Faretta*, *supra*, 422 U.S. at p. 832.)  "A trial court must grant a defendant's request for self-representation if three conditions are met.  First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.]  Second, he must make his request unequivocally. [Citations.]  Third, *he must make his request within a reasonable time before trial*." (*People v. Stanley* (2006)

15.

39 Cal.4th 913, 931-932 (*Stanley*), italics added.)  It follows that a defendant's right to self-representation is absolute only when it is invoked within a reasonable time prior to the start of trial.  (*People v. Williams* (2013) 56 Cal.4th 165, 193.)

If a motion for self-representation is untimely, the request is subject to the discretion of the trial court.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365.)  "Among [the] factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion."  (*People v. Windham* (1977) 19 Cal.3d 121, 128 (*Windham*).)  When evaluating the denial of a belated *Faretta* motion, "a reviewing court must give 'considerable weight' to the court's exercise of discretion and must examine the total circumstances confronting the court when the decision is made." (*People v. Howze* (2001) 85 Cal.App.4th 1380, 1397-1398.)

When a defendant makes a request for self-representation on the day set for trial, the court's discretion "should seldom be exercised in favor of granting the motion." (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1277-1278.)  "Even when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground."  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 433, fn. 15.) If it is shown that an untimely *Faretta* motion was erroneously denied, we apply the harmless error test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058.)

It is undisputed that Johnson's motion for self-representation was made on the date set for trial.  The record thus supports the court's finding, as stated in the minute order, that the motion was untimely.  The trial court therefore had discretion to deny the request. (*People v. Valdez* (2004) 32 Cal.4th 73, 102-103 [*Faretta* motion made shortly before

16.

jury selection was set to begin was untimely and properly denied by trial court]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [*Faretta* motion made on date scheduled for trial was untimely and its denial constituted a proper exercise of discretion]; *People v. Frierson* (1991) 53 Cal.3d 730, 742 [*Faretta* motion made on eve of trial was untimely and its denial was within the trial court's discretion].)  Nevertheless, Johnson contends that the court abused its discretion by failing to expressly weigh each of the so-called *Windham* factors, i.e., the quality of Mr. Soria's representation; Johnson's prior proclivity to substitute counsel, if any; the reasons for his request; the length and stage of the proceedings; and the potential for disruption or delay if the motion were granted. (*Windham, supra,* 19 Cal.3d at p. 128.)  We disagree with this assertion, as case law holds that the denial of an untimely *Faretta* motion is properly affirmed when there is substantial evidence to support the inference that the trial court considered the *Windham* factors at the time of its ruling.  (See, e.g., *People v. Scott* (2001) 91 Cal.App.4th 1197, 1206 ["while the trial court may not have explicitly considered each of the *Windham* factors, there were sufficient reasons on the record to constitute an implicit consideration of these factors"]; *People v. Perez* (1992) 4 Cal.App.4th 893, 904 ["[w]hile the court did not specifically make [a *Windham*] inquiry, . . . there were sufficient reasons on the record for the court to exercise its discretion to deny the request"].)

Although it did so in the context of a *Marsden* hearing, the trial court elicited the relevant procedural history regarding Johnson's prior requests to substitute counsel, gave Johnson the opportunity to explain why he did not want to be represented by his court-appointed attorney, and questioned Mr. Soria regarding his grasp of the facts and issues in the case, his proposed trial strategy, and other matters pertinent to the overall quality of his representation.  Reference to the untimeliness of the *Faretta* motion in the trial court's minute order indicates that the length and stage of the proceedings were taken into consideration.  Furthermore, the parties had already provided a one-month time estimate for the duration of trial, and the court was aware that Johnson was being tried jointly

17.

alongside two independently represented co-defendants. Given this scenario, there was substantial evidence to support the implied finding that granting Johnson's motion would increase the potential for disruption or delay. Under the totality of the circumstances, the denial of Johnson's motion was not an abuse of discretion.

In any event, Johnson has not shown it is reasonably probable that he would have achieved a more favorable outcome but for the denial of his motion. As a practical matter, self-represented laypersons are rarely capable of securing a better result than an experienced attorney could deliver under the same circumstances. (*Faretta*, *supra*, 422 U.S. at p. 834 ["It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts."]; *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1051 ["It is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel."].) It appears Johnson benefitted from Mr. Soria's legal services considering his full acquittal on the conspiracy charge and the jury's rejection of a premeditated first degree murder theory. We have no reason to believe Johnson would have fared better had he represented himself.

As for Johnson's comments during the hearing on April 29, 2011, we conclude that he did not make an unequivocal *Faretta* motion by saying, "I would rather represent myself" or opining that having Mr. Soria as an attorney was the functional equivalent of proceeding in propria persona. References to self-representation during a *Marsden* hearing do not satisfy the unequivocality requirement if "made out of a temporary whim, or out of annoyance or frustration." (*Stanley*, *supra*, 39 Cal.4th at p. 932.) When ambiguity surrounds the defendant's statements, courts must indulge every reasonable inference against a waiver of the right to counsel. (*Id*. at p. 933.) Statements similar to those made by Johnson have been found insufficient to invoke the constitutional right to self-representation. (*People v. Roldan* (2005) 35 Cal.4th 646, 678, 683-684 [affirming a trial court's ruling that a defendant's claim "that he would 'rather represent myself' was

18.

not an unequivocal assertion of his right to self-representation."], disapproved on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Were we to assume Johnson took the necessary steps to renew his *Faretta* motion during the sixth *Marsden* hearing, his claim would still fail under the harmless error analysis set forth above.

**Denial of Dean's Motion to Exclude Evidence of His Confession**

Dean moved in limine to exclude evidence of his confession to police at the time of his arrest. The unsuccessful motion was based on the argument that Dean's admissions were coerced by intimidation and/or promises of leniency, thus rendering his statements involuntary and inadmissible. He renews these arguments on appeal. After viewing the video recordings of his police interviews (and transcripts of same), and considering his arguments under the applicable standards of review, we conclude the evidence of Dean's confession was properly admitted at trial.

Background

On December 17, 2008, Detective McNeal and his partner, Detective Findley, conducted two custodial interviews with Dean at the Bakersfield Police Department. The first interview lasted approximately one hour and 33 minutes. During the initial stages of questioning, Dean denied being at the Willows on the night of the shooting. As the detectives gradually revealed the extent of their knowledge about the incident, Dean began to admit partial details of his involvement. A pattern emerged whereby he would assert denials and/or provide false responses to inquiries unless and until the detectives offered some type of proof that they knew he was lying. When confronted with such proof, Dean would confirm or elaborate upon certain facts. By the end of the first interview, he had admitted to being present at the Willows with Johnson, McDonald, McCowan, and Charles Scott. He also admitted that he heard gunshots, but denied witnessing the shooting or knowing the identity of the shooter(s).

19.

At approximately 72 minutes into the first interview, Dean said that he recalled seeing a blonde Caucasian woman near the crime scene. This disclosure changed the focus of the detectives' questioning for the final 20 minutes. Detective McNeal informed Dean that (1) he had already talked to the woman, (2) she had reported seeing a person who looked like Dean holding a gun, (3) the woman recalled asking if the gun was real, and (4) she claimed the person responded by holding up the gun and/or pointing it at her. Dean adamantly denied that he had been holding a gun, going so far as to say, "I could put my hand on the Holy Bible she didn't see me with no gun, 'cause I didn't have no gun for the last time. I didn't have nothing in my hand that whole night."

At the end of the first interview, Dean asked if he could see the police report or have it read to him. Detective McNeal replied, "Well the whole report is not done, but what I'm telling you about [the] encounter you had with that lady with blonde hair is true. That's what she, that's the statement she made to me and to the other officers out at the scene…. I have a strong feeling that she's gonna identify you as that person she saw and spoke to. You know that right?" Dean answered, "Oh yeah, you could do a line-up and everything." Detective McNeal then said, "I will. She's gonna, she's gonna identify you. I know that."

Dean's second interview lasted approximately 52 minutes, beginning with the following exchange between him and Detective McNeal:

Detective McNeal: Lawrence, we're going to let you [try this] again because you asked that you want to come in here and set the record straight. Am I correct? You still understand your rights that I read you?

Dean: Yeah.

Detective McNeal: The *Miranda* rights. You understand that you have the right to remain silent. You don't have to talk to us.

Dean: Yes sir.

20.

Detective McNeal: You have the right to an attorney [-] to have an attorney present during this questioning. You understand all of that?

Dean: Yes sir.

Detective McNeal: You still want to talk to us? You indicated in there as you were getting ready to be booked in jail that you changed your mind and you want to tell me the truth. Is that correct?

Dean: Yes sir.

Detective McNeal: Okay. I'm going to turn the page over and I am going to give you the floor but please, I don't want any lies. I want just the truth.

Dean proceeded to describe the incident at the Willows in detail, recalling that someone in the group had said something to the effect of, "Shoot the first person you see." After witnessing McDonald shoot the victim with a .22-caliber pistol, Dean fired a shot into the air using a nine-millimeter handgun which Johnson had given to him when they arrived at the apartment complex. He fired the gun to make the rest of the group think that he had shot somebody. Dean also confirmed that the blonde Caucasian woman saw him carrying the gun and asked him if it was real. The latter half of the interview was devoted to questions concerning the gang-related nature of the crime.

The written motion to exclude Dean's confession contained a generalized recital of legal principles without any discussion of the facts in the case. At trial, however, Dean testified to an elaborate story which involved Detective McNeal using methods of psychological pressure and coercion during an intermission between the first and second interviews. He claimed the detectives took him to a 6-by-4-foot room after the first interview was over and kept him handcuffed to a wall for approximately 3.5 hours with no opportunity to drink fluids or use the bathroom. Detective McNeal allegedly checked

21.

in on him every 45 minutes, each time making threats or promises in an effort to elicit a confession. After four such visits, Dean agreed to cooperate.

Detective McNeal allegedly started out by telling Dean, "If you don't come clean, I'm gonna make the judge give you life [in prison]." Dean replied that he could not serve a life sentence because he had a daughter who had just been born 11 days earlier. The detective said that if Dean did not tell him what he wanted to hear, he would never have the opportunity to be a father to his child. When Detective McNeal returned a second time, he supposedly promised that if Dean confessed to firing a nine-millimeter handgun into the air, the charges of conspiracy and murder would be dropped. Dean was also assured that discharging a firearm was not a serious crime. A different approach was employed during Detective McNeal's third visit. He allegedly threatened to place Dean "in a cell full of Hispanics," tell them that he had murdered a member of their race, and then let the Hispanic inmates "go to work" on him. Dean was ready to confess when Detective McNeal returned for the fourth time.

Detective McNeal unequivocally denied Dean's allegations. According to his testimony before the trial court, the break between interviews was less than five minutes long. A uniformed officer did place Dean in a 6-by-4-foot holding area during that time, but Detective McNeal did not communicate with him while he was in that room. The second interview was initiated after an officer informed Detective McNeal that Dean wanted to speak with him again.

The parties agreed that Dean was arrested at approximately 4:00 p.m. on December 17, 2008. Dean claimed that he was immediately taken to the "blue room" depicted in the video recordings of his interviews, and that questioning from Detectives McNeal and Findley commenced "right then and there." However, the police report indicated that the interview did not begin until 6:35 p.m. Detective McNeal attested to the start time documented in the report, but did not know what had previously occurred while Dean was under the supervision of other police officers at the station. He believed

22.

Dean had been placed in one of the smaller holding areas (i.e., the 6' x 4' rooms) for an unknown period of time before being brought over to the "blue room" where the interviews took place.[5]

On cross-examination, Dean's trial counsel confronted Detective McNeal with records showing that his client was booked into the county jail at 11:30 p.m. Counsel thus challenged the notion that the second interview had ended at approximately 9:00 p.m. Dean testified on redirect examination that he was processed immediately upon his arrival at the jail, with no wait time for the booking procedures.

The prosecution refuted Dean's timeline of events by producing a copy of his "field arrest data card." This document indicated that he had arrived to the jail at 9:07 p.m. A Kern County Sheriff's Deputy from the jail's Central Receiving Facility provided testimony regarding the information contained on the card, and explained the difference between the arrival time (9:07 p.m.) and the booking time noted on Dean's mugshot profile (11:30 p.m.). The former showed what time the Sheriff's Department took custody of Dean at the jail, while the latter documented the completion of his booking process.

Oral arguments followed the parties' presentation of evidence on the motion. Once the matter was submitted, the trial court stated its ruling for the record:

> "From a review of the totality of the circumstances, including the two DVD
> videos with audio, the body language of Mr. Dean, his testimony in court,
> [and] the testimony of Detective McNeal, it would appear to me and my
> conclusion is, from the totality of the circumstances, that the confession
> was voluntary.

---

[5] There is support for this version of events in the video footage of the first interview. At the end of the interview, as Dean is being escorted away by a uniformed officer, the officer says to him, "Back to the same room you were in."

23.

"The People have met their burden in showing it was not violative of defendant's right against compulsory self-incrimination and not violative of his right to due process of law. It was not coerced. There were no threats of violence. There was no information obtained or extracted by direct or implied promises or any use of improper influence or express or implied promises of leniency or benefits. I found no deception or subterfuge used, and no causal connection between anything that was said or any promises that were made. I didn't detect any promises being made.

"And what I thought was kind of insightful was the way in which the second interview starts…. [Whereupon the trial court quoted the same exchange we have reproduced above beginning with Dean's waiver of his right to remain silent.]

"I find that from looking at this transcript and also the admission of Mr. Dean that he did lie, that his abilities to reason, comprehend, or resist were not so disabled that he was incapable of free or rational choice. There is no showing of or any proof of any physical or psychological coercion.

"The second interview, when set side-by-side with the first interview, seems to be more of a voluntary testimony in his body language, moving forward towards the table and the camera, more forthcoming and more credible, and I have to judge the credibility of Detective McNeal vis-à-vis Mr. Dean, in part, in coming up with this ruling to deny the motion to suppress the gentleman's confession."

Analysis

An involuntary confession is inadmissible under the due process clause of the Fourteenth Amendment to the federal Constitution and article I, sections 7 and 15, of the California Constitution. (*People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*); *People v. Benson* (1990) 52 Cal.3d 754, 778 (*Benson*).) "'A statement is involuntary if it

24.

is not the product of "'a rational intellect and free will.'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed." [Citation.]'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.) To make this assessment, courts evaluate "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).)

It is the prosecution's burden to establish by a preponderance of evidence that a defendant's confession was voluntarily made. (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).) "'""Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation.]' [Citation.] A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession." (*Linton*, *supra*, 56 Cal.4th at p. 1176.)

A ruling on the voluntary or involuntary nature of a confession is largely subject to de novo review on appeal. "[T]he determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently in light of the record in its entirety, including 'all the surrounding circumstances….'" (*Benson*, *supra*, 52 Cal.3d at p. 779.) In that respect, the trial court's determinations concerning whether police activity was coercive, whether certain conduct constituted a promise and, if so, whether it operated as an inducement, are reviewed de novo. (*Ibid*.) However, the trial court's findings as to the circumstances surrounding the confession, including disputed issues of fact, are reviewed under the deferential substantial evidence standard. (*Ibid*.; *People v. Weaver* (2001) 26 Cal.4th 876, 921 ["we independently examine the record, but, to the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence."].) In other words, "'""we accept the trial court's resolution of

disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.'"""  (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

Several of Dean's arguments revisit his allegations of police misconduct in between his first and second custodial interviews.  The trial court found that these alleged incidents did not occur.  Its findings are supported by substantial evidence, including the evidence proffered by the prosecution to demonstrate the unlikelihood, if not impossibility, of Dean's timeline of events.  The court's findings also turned on credibility determinations as between Dean and Detective McNeal.  Those determinations were supported, inter alia, by Dean's demonstrated willingness to lie in order to avoid the consequences of his actions.  Therefore, the scope of our independent review is effectively limited to the words and behavior captured on camera during the course of the interrogations.

Dean's complaints regarding the verifiable conduct of Detectives McNeal and Findley fall into two general categories.  First, he argues it was improper for them to repeatedly call him a liar and to chastise him for not taking responsibility for his involvement in the shooting.  Second, he claims certain statements made in reference to the death penalty and/or the possibility of facing life in prison had a coercive effect on his decision to confess.  Dean further argues that he was a naïve and unsophisticated youth at the time of the interviews, and these attributes exacerbated the impact of the detectives' behavior.

Regarding the first set of arguments, it is settled that "[n]o constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence." (*Carrington*, *supra*, 47 Cal.4th at p. 174.)  In the absence of improper threats or promises, law enforcement officers are permitted to urge that it would be better for the suspect to tell the truth. (*People v. Williams* (2010) 49 Cal.4th 405, 444 (*Williams*).)  Here, the detectives did more than baldly assert that Dean was a liar; they substantiated their accusations by producing pictures of Ms. Montiel's

van and photographs of the other suspects in the case, and disclosing details of what they had learned about the incident from various sources. The repeated use of this tactic did not render the confession involuntary or unreliable.

As for comments regarding the potential consequences of a murder conviction, "'a confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand.'" (*Holloway*, *supra*, 33 Cal.4th at p. 116.) A constitutional violation occurs in this context "only where officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises." (*People v. Ray* (1996) 13 Cal.4th 313, 340.) Such is not the case here.

Dean's arguments focus on the following exchange with Detective Findley:

Detective Findley: Someone that is bold enough and bad enough to give themselves the entire Carnation Trac[t] name you must be one badass to come up with this whole plan to go murder a fucking Eastside Crip gang member at the Willows. Amazing. You know what the other penalty for murder is?

Dean: What?

Detective Findley: [I'm asking you.]

Dean: [The death penalty?]

Detective Findley: You're the only adult. The only adult. Everyone else is a juvenile.

Dean: Okay. Y'all can give me what y'all want to give me. 'Cause I already, you know I already, I already –

Detective McNeal: Okay hold on a second. Hold on a second.

27.

| | |
|---|---|
| Detective Findley: | Do you know what the difference [is] between death and life without?  Remorse. |
| Detective McNeal: | Are there, besides these guys that were right here, who owns that van? |
| Dean: | His mom. |
| Detective McNeal: | I asked his mother.  I said ma'am, your van was seen at the scene of a homicide…. |

On the video, Dean seems unfazed by Detective Findley's comments.  The questioning immediately shifted to a different topic, and Dean continued to deny his role in the incident.  Like the defendant in *Williams*, *supra*, "[h]e exhibited no sign of distress in response to references to the death penalty, and remained able to parry the officers' questions." (*Williams*, *supra*, 49 Cal.4th at p. 443.)  Even assuming arguendo that the detective's comments were improper, we do not find a causal connection sufficient to conclude the defendant's will was overborne by prohibited interrogation tactics.  The turning point came later in the interview when Dean made the mistake of volunteering information about Darlene Graham, i.e., the blonde Caucasian woman.  Even then, he seemed only slightly unnerved by the detectives' reactions to his disclosure, but his demeanor changed once it became apparent that they had found an eyewitness who might be able to place him at the crime scene with a gun in his hand.  Dean's behavior at the end of the first interview suggests he was motivated to tell the truth out of concern that the police might believe it was him, rather than McDonald, who actually shot the victim.

Factors to be weighed in our overall analysis include "'"'"the crucial element of police coercion,'"'"'" as well as the location, length, and continuity of the interrogation. (*People v. Boyette* (2002) 29 Cal.4th 381, 411.)  We also consider the defendant's maturity, intelligence, physical condition, and mental health.  (*Ibid*.)  The interviews in this case were conducted in a space that looked more like a waiting room in a doctor's office than an interrogation facility at a police station.  Dean made his confession after

only one hour and 33 minutes of questioning, and we must accept the trial court's implied finding that the break between the first and second interviews was short. The tone of the interrogation was calm and conversational throughout. Dean maintained a confident and rather nonchalant attitude, and the detectives refrained from yelling or even talking loudly.

Dean's briefs emphasize that he was barely 18 years old at the time of his arrest and had never before been in a position where he had to consider exercising his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436). Yet contrary to what he would have us believe, the video footage does not portray him as a naïve, unintelligent, or gullible individual. If anything, we agree with the observations made by the prosecutor at trial: Dean was clearly able to evaluate his own self-interest in deciding whether to disclose or withhold information, and "behaved in a strategic and probing manner in an attempt to determine what the officers knew" about his involvement in the crime. All things considered, the record does not compel the conclusion that his will was overborne such that the decision to confess was not freely self-determined. We thus find, under the totality of the circumstances, that the confession was voluntary.

**Confiscation and Viewing of Johnson's Written Notes**

Appellants seek reversal of their convictions based on an incident at trial during which a courtroom deputy confiscated a note that was passed from Johnson to Dean while their attorneys were engaged in a sidebar conference. The note was read by the deputy and Detective McNeal, who was also involved in the incident. It later came to light that in the midst of this activity, the same deputy read the contents of two additional notes he had found in a trash can, which may have contained communications between Johnson and his attorney, Mr. Soria. Appellants characterize the actions of Detective McNeal and the trial court's security team as "egregious governmental misconduct," which allegedly violated their constitutional rights to engage in confidential attorney/client communications and to receive a fair trial from an impartial jury. We

29.

agree that the parties involved in this unusual series of events behaved inappropriately. However, the incident did not warrant a mistrial or otherwise involve reversible misconduct.

Background

The incident occurred on the second day of the prosecution's case-in-chief, during a break in the cross-examination of witness Paul Torrealba. While the attorneys were conferring with the trial judge outside of the courtroom, Johnson wrote a note to Dean and passed it to him. A courtroom security guard, Deputy Geherty, walked over to the defense table and asked Dean for the note. Dean ripped up the note and dropped the pieces into the deputy's hand. Deputy Geherty subsequently threw the pieces of paper into a trash can.

Later, at the direction of Detective McNeal, two members of the courtroom security team retrieved the scraps of paper from the trash and pieced them together with tape. Deputy Geherty later showed the reconstructed note to Detective McNeal, and also reviewed the contents of two additional notes that were found wadded up in the same receptacle. All three messages were written on purple Post-it notes or "sticky notes."

Once the matter was brought to their attention, the defense attorneys moved for a mistrial. In considering the motion, the trial court received testimony from Deputy Geherty and also asked its courtroom bailiff and Detective McNeal to shed further light on the incident. The defense presented testimony from a woman named Lauren Dean (presumably a relative of Lawrence), who described what she had observed from the gallery.

The bailiff tried to put the events in context by explaining he had warned the defendants at the beginning of trial that they were not to pass notes between themselves since they were on "keep away" status at the jail. Thus, the bailiff submitted, "[a]nything they pass between them is violating [the keep away order] as far as the sheriff's department's concerned." Despite the admonishment, defendants were caught passing

30.

some kind of article or advertisement about pit bulls on the day before the subject incident. They received a second warning, and the bailiff told them again, "no note-passing." Defendants were advised that passing notes to their respective attorneys was permissible, but the direct exchange of written communications with each other was prohibited unless they allowed the bailiff to view the writings in advance.

Detective McNeal claimed he saw the defendants giving "hard looks" to Paul Torrealba during the break in cross-examination. More specifically, he observed Dean making eye contact with the witness while simultaneously cracking his knuckles. Dean and Johnson then spoke to each other, and Johnson slid a note over to Dean for him to read. Concerned some type of witness intimidation effort might be afoot, Detective McNeal gestured to Deputy Geherty. The guard responded by approaching the defendants and asking Dean for the note.

After throwing the pieces of paper into a trash can, Deputy Geherty walked over to where Detective McNeal was sitting and briefly discussed the situation with him. The detective said that he wanted to know what was written on the note. The guard and the courtroom bailiff subsequently pieced the note together, but did so discreetly at the bailiff's desk, which was allegedly shielded from the jury's view. While pulling the torn pieces of paper out of the trash can, they also found two crumpled up notes written on the same purple-colored paper. Later, outside the presence of the jury, Deputy Geherty delivered the reconstructed note to Detective McNeal and summarized the contents of the other two messages.

By all accounts, the note that was confiscated from Dean contained a request by Johnson for Dean to ask his lawyer (i.e., Dean's lawyer, David Evers) to question Paul Torrealba about something he had said during his testimony. No one could recall the contents of the other two notes (the deputy threw them back into the trash can after reading them). Johnson's attorney, Mr. Soria, believed those notes were written to him by his client, though he offered no insight into what they might have said. Mr. Soria had

31.

discarded the notes into the trash can himself, but found it objectionable that the court's security team retrieved and read them without his or Johnson's permission. The prosecutor represented that he had no knowledge of what was contained in any of the notes.

The trial court felt the incident was "entirely inappropriate," but found defendants' rights to a fair and impartial trial were neither compromised nor prejudiced, and that any negative impact the events may have had on the jury could be remedied with an admonition. Accordingly, the motion for a mistrial was denied. The jury was later admonished as follows: "Ladies and gentlemen, it came to our attention that during an afternoon sidebar yesterday that a deputy and Detective McNeal obtained a note from a defendant at counsel table and had some form of communication or interaction between themselves outside of my presence and that of the attorneys. We were on sidebar back in the hallway. [¶] This is not evidence. This is not evidence. And you are not to in any way speculate about the reason for the events I just mentioned, nor – and then you are to further, you are to further, completely disregard those events or circumstances in deciding the issues in this case. Do not consider this for any reason or any purpose or discuss it during your deliberations or at any other time. [¶] Further, as I reminded you on so many times and occasions, your verdict is to be based solely on the evidence presented in this courtroom and the law in the form of jury instructions, and what you may have observed yesterday during the sidebar – or while we were out on a sidebar is not evidence…."

Analysis

As a preliminary matter, appellants' attorney/client privilege arguments are misplaced with respect to the note that was confiscated from Dean. Evidence Code section 954 recognizes in certain individuals "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." As the statute indicates, the privilege flows from the establishment of a

32.

professional relationship between the client and his or her attorney. (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1130.) "Once this relationship is established, the attorney-client privilege attaches to communications made in confidence during the course of the relationship." (*Ibid.*) Dean and Johnson enjoyed no such relationship with one another, nor did Johnson have an attorney/client relationship with Dean's attorney, Mr. Evers. There was no evidence of a joint defense agreement, and none has been alleged by the parties on appeal. (See *People v. Shrier* (2010) 190 Cal.App.4th 400, 413 ["'Typically, a joint defense agreement protects information shared by defendants after a lawsuit has been filed, and it serves the purpose of protecting from disclosure the joint defendants' trial strategies and preparation.'"].) The mere fact that Johnson sought to use Dean as a conduit for the exchange of information or ideas between himself and Dean's attorney did not bestow upon his writing the protection of attorney/client confidentiality. The communication was not privileged.

Focusing still on Johnson's note to Dean, the question to be answered is whether the events that transpired in front of the jury were so suggestive of wrongful behavior by the defendants that the jurors' ability to remain impartial was irreparably damaged. Outside of the attorney/client privilege arguments, the alleged likelihood of such prejudice was the basis for defense counsel's request for a mistrial. We review the trial court's denial of that request under the deferential abuse of discretion standard. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068 (*Wallace*).) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citaiton.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*Ibid.*)

Our analysis is partially guided by the rule that a defendant is not permitted to profit from his own misconduct. (*People v. Huggins* (2006) 38 Cal.4th 175, 201; see also, *People v. Hendricks* (1988) 44 Cal.3d 635, 643 ["a defendant may not be heard to

complain when, as here, such prejudice as he may have suffered resulted from his own voluntary act."].)  While it may not be appropriate to characterize Dean and Johnson's behavior as "misconduct" per se, they were certainly blameworthy for instigating the events of which they now complain.  Having been repeatedly advised of the bailiff's courtroom protocol regarding direct communication with each other, they had every reason to expect that passing notes would prompt a reaction from the security staff.  Dean made more of a spectacle out of the situation than was necessary by tearing the note into pieces before turning it over to the guard.  On the other hand, Detective McNeal and Deputy Geherty could have easily voiced their concerns to the trial court during the sidebar, and should have done so rather than taking matters into their own hands while jurors were present.  All parties involved handled the situation poorly.  Nevertheless, we must give considerable deference to the trial court's assessment of the overall circumstances, and are not convinced that the court abused its discretion by refusing to grant a mistrial.

The remaining issue concerns the two notes presumably written by Johnson to Mr. Soria.  We will assume for purposes of this discussion that the pieces of paper contained attorney/client communications.  Appellants argue that the retrieval and review of those notes by court personnel, and disclosure of their contents to Detective McNeal, constituted a governmental intrusion upon Johnson's rights under the Sixth Amendment to the federal Constitution and also had a chilling effect on defendants' ability to communicate with their respective attorneys during trial.  Appellants further contend that the proper remedy for these violations is outright dismissal of their charges.  Alternatively, they seek reversal and remand for a new trial.

To effectuate the constitutional right to effective representation of counsel, communications between a defendant and his or her attorney are considered private and may not be intruded upon by the government.  (*Barber v. Municipal Court* (1979) 24 Cal.3d 742, 750-753 (*Barber*).)  A defendant's right to effective assistance of counsel

34.

under the federal constitution may be violated if the state's intrusion into the attorney/client relationship creates "a realistic possibility of injury to [the defendant] or benefit to the State . . . ." (*Weatherford v. Bursey* (1977) 429 U.S. 545, 558; *People v. Alexander* (2010) 49 Cal.4th 846, 888-889 (*Alexander*).) There is precedent for the drastic remedy of dismissal in rare cases where "egregious governmental misconduct" involving bad faith interference with attorney/client confidentiality deprived a defendant of due process and the ability to receive a fair trial. (See, e.g., *Barber*, *supra*, 24 Cal.3d at pp. 745-750 [law enforcement agent posing as a co-defendant attended numerous confidential attorney/client conferences during which defense strategy was discussed]; *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1255 (*Morrow*) [prosecutor instructed investigator to eavesdrop on defendant's confidential discussions with his attorney in the courtroom's holding area].)

Appellants' arguments rely heavily on the holding in *Morrow*, *supra*. There, an investigator acting on specific instructions from the prosecutor overheard privileged attorney/client communications while eavesdropping on a conversation between the defendant and his lawyer. (*Morrow*, *supra*, 30 Cal.App.4th at p. 1255.) The *Morrow* opinion holds that when a prosecutor "orchestrates an eavesdropping upon a privileged attorney-client communication in the courtroom and acquires confidential information, the court's conscience is shocked and dismissal is the appropriate remedy." (*Id*. at p. 1261.) However, the California Supreme Court has clarified that governmental intrusion into the attorney/client relationship does not automatically require reversal of a defendant's conviction. "In other words, a court properly rejects a Sixth Amendment claim based on surreptitious state participation in communications between a defendant and his or her attorney or the attorney's agent when the record demonstrates there was no realistic possibility of injury to the defendant or benefit to the prosecution." (*Alexander*, *supra*, 49 Cal.4th at pp. 888-889.)

This case is distinguishable from *Morrow* in several respects. Here, there was no eavesdropping or surreptitious monitoring of attorney/client communications, but rather a somewhat incidental review of two Post-it notes which Johnson's own attorney had seen fit to deposit into a trash can located next to the bailiff's desk. More importantly, the undisputed evidence shows the prosecution had no involvement in the incident, was oblivious to what was going on as the events played out, and did not acquire any confidential information regarding the defense case. (See *People v. Ervine* (2009) 47 Cal.4th 745, 764-765, 770-771 (*Ervine*) [dismissal not warranted where jail personnel seized defense documents from defendant's jail cell but did not communicate information to the prosecution]; *People v. Towler* (1982) 31 Cal.3d 105, 120-122 [dismissal not warranted where the district attorney seized a document from defendant but there was no showing that the contents of document aided the prosecution]; see also, *United States v. Morrison* (1981) 449 U.S. 361, 365 ["absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though [government interference with right to counsel] may have been deliberate."].)

Appellants argue that the knowledge of Deputy Geherty and Detective McNeal is imputed to the prosecution, but the authorities cited for this proposition are inapposite. The cases upon which they rely involve discovery disputes, and a prosecutor's duty to disclose material exculpatory evidence. (E.g., *In re Brown* (1998) 17 Cal.4th 873, 879 ["As a concomitant of this duty, any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution."].) As for the claim that the incident may have had a chilling effect on defendants' ability to communicate freely with their legal counsel, the argument is far too speculative to establish actual prejudice. (*Ervine*, *supra*, 47 Cal.4th at p. 769 ["a defendant's inability to consult with counsel or to assist in his defense must appear in the record."].) Even if we accept the argument that the government actors engaged in conduct rising to the level of a constitutional violation, prejudice has not been shown. As discussed, there is nothing in the record to suggest that

any type of defense strategy or confidential information was communicated to the prosecutor, or that the State otherwise acquired information that could realistically be expected to impede the defense or advantage the prosecution. (See *Alexander*, *supra*, 49 Cal.4th at p. 889; *Ervine*, *supra*, 47 Cal.4th at p. 770.) In the absence of such a showing, there are no grounds for reversal.

**Use of Leg Restraints in the Courtroom**

Johnson contends that his conviction should be reversed because the trial court required him to wear leg restraints during portions of the trial. At no time were the restraints visible to the jury. The claim is governed by the analysis set forth in *Wallace, supra,* under which it is clear that Johnson cannot establish reversible error.

Background

On May 16, 2011, an individual identified as "Sergeant King" requested that the trial court order Johnson to be placed in leg restraints for the remainder of trial. The request was precipitated by an incident that occurred at the courthouse on the previous day of trial, which involved a physical altercation between Johnson and a "Deputy Young" after Johnson refused to obey an order. Sergeant King noted that Johnson had already been written-up approximately nine times at the county jail for destruction of property, failing to obey staff orders, verbally threatening staff, and possession of a homemade weapon (described as a sharpened five-inch plastic item).

The trial court granted Sergeant King's request, thereafter requiring Johnson to wear leg restraints during all trial proceedings. His restraints were fastened to an eyebolt in the floor underneath the defense table. The record shows the trial court took appropriate steps to ensure the restraints were hidden from the jury's view at all times, and there is no evidence the jurors were ever aware that Johnson was subjected to these heightened security measures.

Johnson asserts that he was "denied his rights to due process, a fair trial, an unbiased jury, and to be free of physical restraints, in violation of the Fifth, Sixth, Eighth

and Fourteenth Amendments to the United States Constitution, and California law, because the court required him to be shackled during his trial." In support of these claims, he further contends that the trial court abdicated its duty to make a discretionary decision regarding the use of leg restraints by deferring to the judgment of court security personnel.

Analysis

To avoid potential impediments to a fair trial, a criminal defendant may not be forced to wear physical restraints in the courtroom unless there is a "manifest need" for such measures. (*People v. Mar* (2002) 28 Cal.4th 1201, 1216, 1219.) The United States Supreme Court has held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 629.) Furthermore, the trial court "may not delegate to law enforcement personnel the decision whether to shackle a defendant." (*People v. Seaton* (2001) 26 Cal.4th 598, 651.) However, error in the use of restraints is harmless if there is no evidence the jury saw the shackles during trial and no evidence the shackles impaired or prejudiced the defendant's right to testify or participate in his or her defense. (*People v. Anderson* (2001) 25 Cal.4th 543, 596; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 ["We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury."].)

The same arguments raised by Johnson in this appeal were considered by the California Supreme Court in *Wallace, supra,* under an analogous set of facts and circumstances. The *Wallace* defendant had been shackled to the courtroom floor during his murder trial after being cited for numerous behavioral infractions at the county jail. (*Wallace, supra*, 44 Cal.4th at pp. 1049-1050.) The defendant's misconduct included fighting and possession of illegal razors. This evidence was deemed sufficient to support the trial court's decision to restrain the defendant at trial. (*Id.* at p. 1050.)

Notwithstanding that conclusion, the high court provided the following harmless error analysis:

> "Further, even assuming the trial court abused its discretion, defendant suffered no possible prejudice. Determining whether or not the erroneous imposition of restraints on a defendant was prejudicial requires us to consider the 'possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand. [Citation.] The first and last of these considerations are the most significant. [Citation.]
>
> "Defendant admits the record contains no indication that the jurors knew he was restrained or that they were otherwise prejudiced against him. Defendant urges us, however, to depart from the prejudice analysis we have applied for over 30 years, and to focus instead on the psychological effects on a defendant – specifically, mental impairment, physical pain, and obstruction of communication with defense counsel – that result from the imposition of restraints. Even if we were inclined to do so, defendant points to no evidence that he suffered from any such adverse effects. Nor does defendant point us to any evidence in the record that the restraint influenced his decision[] to testify…. Indeed, defendant acknowledges that the record is silent on this point. Thus, defendant cannot demonstrate prejudice resulting from his restraint."

(*Wallace*, *supra*, 44 Cal.4th at pp. 1050-1051.)

Here, as in *Wallace*, there is no evidence Johnson's leg restraints were visible to the jury or that the use of those restraints had an impact on his decision not to testify. Regarding the latter consideration, there is affirmative evidence to the contrary. On

39.

May 24, 2011, during a closed hearing on yet another *Marsden* motion, it was revealed that Johnson and his trial attorney had debated the potential consequences of him taking the stand in his own defense. Johnson apparently had some inclination to testify, but his attorney felt it would be "foolhardy," and strongly advised against such a decision because of the likelihood that he would open the door to areas of inquiry which the defense attorneys had maneuvered to avoid.

Johnson later told the trial judge: "I understand that it's my choice and it's my decision if I want to get up there and testify. I understand that. But I'm not gonna testify. But I'm not. Because it's too late in the trial." Johnson's explanation is a bit puzzling since the defense had not yet begun its case-in-chief at the time of the *Marsden* hearing, but there is nothing in the record to suggest that the leg restraints played a role in his decision not to take the stand.

Johnson points out that he attempted to waive his right to be present during a jury instruction conference held on May 31, 2011 after the trial judge indicated that he would have to wear handcuffs during the hearing. He downplays the fact that handcuffs were used on this occasion because he had allegedly made threatening comments to one or more deputies earlier that morning. We also find an evidentiary and causal disconnect between the lone incident with the handcuffs and Johnson's argument that the use of leg restraints materially impaired his ability to participate in his defense. In short, he has failed to establish reversible error.

**Opinion Testimony by Officer Beagley**

McDonald argues that the prosecution's gang expert, Officer Beagley, was erroneously permitted to offer opinions regarding the defendants' guilt through the use of an improper hypothetical question. Dean and Johnson join in his claim. Their position is at odds with the controlling authority on this issue, *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*).

40.

<u>Background</u>

The challenged hypothetical and the expert's response thereto were as follows:

Prosecutor:   Officer Beagley, I'm going to ask you a hypothetical.  I'm going to ask you to assume the facts of the hypothetical are true.  Then I'm going to ask you to render an opinion based on that hypothetical….

Six members of the Westside Crips possess two handguns, enter a van and drive to the Willows apartment complex.  This is an area known to contain members of the Eastside Crips.  Once they arrive at the Willows, five of the six get out of the van and enter the apartment complex on foot.  Once inside the apartment complex the Westside Crips locate several individuals in a grassy quad area of the apartment complex.  At this point the Westside Crips circle around the apartment complex in an attempt to come up behind them.  On the way, one of the Westside Crips asks for one of the – asks for the smaller of the two guns because the larger gun is too large for his hands.

One of the subjects in the grassy quad area leaves the group and is shot by the person who asked for the smaller gun.  That shot results in the death of the victim and the shooting, in general, causes the rest of the subjects in the grassy quad area to flee.  The other Westside Crip with a gun ends up standing where the subjects had been standing on the grassy quad area and fires a single shot in the direction the victim fled.  All the Westside Crip members then flee the area.

41.

Do you have an opinion about whether or not this activity is committed for the benefit of or in association with the Westside Crips?

[Defense objections are made and overruled]

Expert: Yes.

Prosecutor: What is your opinion?

Expert: That it is committed for [the] benefit of and in association with the Westside Crips.

Prosecutor: Why do you say that?

Expert: First of all, for the benefit of, the active shooting of a rival gang member is going to spread fear and intimidation throughout that area and both gang neighborhoods for not only the individuals that committed the crime, but the Westside Crips as a whole; therefore benefitting the gang as a whole. Also, the Westside Crips individually are going to gain respect from their fellow gang members within their gang for committing such an act of violence.

It's in association with the gang as there are more than one Westside Crip involved in this crime. There are six in total; therefore, they are really associating with one another while committing this heinous act of violence….

McDonald complains that the prosecution's background scenario was improper because it "precisely mirrored the elicited facts in this case" and was obviously intended to be in reference to specific individuals rather than a truly hypothetical group of people. He further contends that Officer Beagley's opinions spoke to the ultimate issue of the defendants' guilt or innocence, thereby usurping the jury's role as the trier of fact.

Analysis

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id.*, at subd. (a).) The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

In *Vang*, *supra*, it was alleged that multiple defendants committed a felony offense for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). (*Vang*, *supra*, 52 Cal.4th at pp. 1041-1042.) The prosecutor presented expert testimony with respect to the history, characteristics and motives of a particular gang. The prosecutor also asked its gang expert hypothetical questions which "closely tracked the evidence in a manner that was only thinly disguised." (*Id.* at p. 1041.) The case reached the California Supreme Court after the Court of Appeal held that the trial court erred by allowing the expert to respond to the hypothetical questions. (*Ibid.*) The high court reversed, concluding the hypothetical questions, and their recitation of the evidence against the defendants, were appropriate.

The *Vang* opinion notes that hypothetical questions used to elicit testimony from a gang expert "must be rooted in the evidence of the case being tried, not some other case." (*Vang*, *supra*, 52 Cal.4th at p. 1046.) "Expert testimony *not* based on the evidence will not assist the trier of fact… [therefore,] the prosecutor's hypothetical questions had to be based on what the evidence showed *these* defendants did, not what someone else might have done. The questions were directed to helping the jury determine whether *these* defendants, not someone else, committed a crime for a gang purpose. Disguising this fact would only have confused the jury." (*Ibid.*, original italics.) Accordingly, the Court held

that "[t]he Court of Appeal erred in condemning the hypothetical questions because they tracked the evidence in a manner that was only 'thinly disguised.'" (*Id.* at p. 1045.)

Answers to hypothetical questions which closely track the facts in evidence are distinct from direct opinions about a defendant's guilt or innocence. (*Vang*, *supra*, 52 Cal.4th at p. 1049.) Unlike questions of guilt or innocence, hypothetical questions do not invade the province of the jury: "[E]xpert testimony is permitted even if it embraces the ultimate issue to be decided. (Evid. Code, § 805.) The jury still plays a critical role in two respects. First, it must decide whether to credit the expert's opinion at all. Second, it must determine whether the facts stated in the hypothetical questions are the actual facts, and the significance of any difference between the actual facts and the facts stated in the questions." (*Id.* at pp. 1049-1050.)

Appellants fail to show that the hypothetical questions in this case deviated from the format authorized by *Vang*. They also fall short of carrying their burden with respect to the admissibility of Officer Beagley's responses to those questions. (*Vang*, *supra*, 52 Cal.4th at p. 1048 ["'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement."].) We therefore reject their assertions of error.

**Ex Parte Viewing of the Crime Scene by the Trial Court**

McDonald seeks reversal of his conviction based on the trial court's viewing of the Willows apartment complex without the involvement of, or advance notice to, the parties and their legal counsel. Dean and Johnson join in this claim. We conclude the decision to view the crime scene on an ex parte basis was imprudent, and likely constituted error, but the error was harmless.

Background

On April 4, 2011, the prosecution filed a series of motions in limine which included a request pursuant to section 1119 to have the jury view the crime scene.[6] The final two sentences of the motion read: "I have personally toured the scene and walked the path of both the shooters and the victim, and I am of the opinion that there is no adequate substitute for actual presence at the scene of the crime. The People would request that the Court consider viewing the location of the shooting prior to ruling on this motion."

The contested motion was briefly heard and considered on April 5, 2011, but the trial court deferred its ruling until "towards the end of the case." The matter was revisited during a break in the proceedings on May 16, 2011, at which time McDonald's trial attorney voiced his opposition to the motion. The defense was especially opposed to a daytime viewing of the scene because the conditions would give jurors "a very distorted idea of what could be seen out there [at the time of the crime]," but also urged against a nighttime visit because it would be difficult to replicate lighting and other conditions to match the scene as it looked when the shooting occurred.

On May 18, 2011, at the request of the trial court, the prosecution filed another written motion outlining its arguments on the issue. As before, the prosecution included the following statement at the end of its pleading: "The People would request that the Court consider viewing the location of the shooting prior to ruling on this motion." On

---

[6] Section 1119 provides: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred… it may order the jury to be conducted in a body, in the custody of the sheriff or marshal, as the case may be, to the place, or to the property, which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself or herself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."

May 19, 2011, the parties reiterated their respective positions on the proposed jury view and also discussed logistical matters, including the trial court's concern over security and safety issues. The attorneys were instructed to return to court the following day for a further hearing on the motion.

When the parties reconvened on May 20, 2011, the trial judge disclosed that he had visited the Willows earlier that afternoon, noting "[t]here was a request to do that contained in the instant motion filed on May 16th." Accompanied by a member of the sheriff's department and his courtroom bailiff, the judge had walked along the perimeter of the complex and then went inside to view the crime scene and other relevant locations described during trial. Their tour of the premises drew the attention of a large number of "young black African-American" males who stared at them as they walked around the complex.

While recounting his experience at the Willows, the judge said, "I have serious concerns about the safety of the defendants, the jurors, the attorneys, court personnel, and I really – I really have some concerns." He noted that the complex appeared as it had been described in the trial testimony and as depicted in the parties' photographs. The prosecutor responded to the court's comments by acknowledging that the Willows was located in a high crime area and posed a variety of dangers to outside visitors. McDonald's attorney said, "As far as the Court's comments, I must say I'm nonplussed by your investigation without counsel or defendants present. But in any event, I oppose the jury view and I'll submit."

The court denied the prosecution's motion on the following grounds: "I think that there are reasonable alternatives to a jury view and I'm making a finding that it would be inappropriate and not proper and pose all kinds of security risks and compromise the jury's duty to decide the case solely on the evidence and the law, and respectfully deny the request."

McDonald later moved for a mistrial based on the trial court's ex parte visit to the crime scene. The ex parte viewing was also cited as a basis for his motion for a new trial. On appeal, he maintains that the court committed reversible misconduct by relying on information obtained from an independent investigation to make findings of fact regarding the dangerousness of the location where the events at issue took place.

Analysis

We have located very few cases involving the ex parte viewing of a geographic location by a trial judge. In *Noble v. Kertz & Sons Feed & Fuel Co.* (1945) 72 Cal.App.2d 153 (*Noble*), reversible error was found where a judge conducting a bench trial independently viewed an accident scene without the parties' consent and used his observations as the basis for his decision in the case. The opinion holds that "a view without consent cannot be considered independent evidence on a controverted issue so as to support alone a finding otherwise not supported by other evidence, and, in fact, contrary to the evidence introduced." (*Id.* at p. 160.) "To hold otherwise would permit the trial judge to base his findings on what he observed without giving the parties the opportunity to explain or to supplement such observations, or to cross-examine the witness." (*Ibid.*)

In *People v. Jackson* (1990) 218 Cal.App.3d 1493 (*Jackson*), a bench trial on charges of manufacturing phencyclidine (PCP) was submitted to the judge on the transcripts of preliminary hearings, a hearing on a motion to suppress evidence, and several evidentiary stipulations by the parties. (*Jackson*, *supra*, 218 Cal.App.3d at p. 1497 and fn. 1.) On appeal from their convictions, defendants argued that the magistrate who presided over their preliminary hearings erred by visiting the site of the alleged PCP lab on an ex parte basis and relying on his observations to determine that the site was located in an isolated and rural area. (*Id.* at p. 1505.) The appellate court found the magistrate's actions were improper, reasoning that "[t]o permit a judge to base a finding, even in part, upon an ex parte view of the crime scene would sanction the impermissible

47.

taking of evidence outside of court without the presence of the parties and counsel." (*Ibid.*, citing *Noble*, *supra*, 72 Cal.App.2d at p. 158.) The opinion further indicates that any viewing conducted pursuant to section 1119 should adhere to the procedural requirements of Code of Civil Procedure section 651, which mandate that "'[t]he court shall be in session throughout the view'" and "'proceedings at the view shall be recorded to the same extent as the proceedings in the courtroom.'" (*Jackson*, *supra*, 218 Cal.App.3d at p. 1505; Code Civ. Proc., § 651, subd. (b); see, Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2013) § 8.35, p. 199 ["If the magistrate wishes to take evidence outside the court, he or she must follow the relevant procedures in [Code Civ. Proc.,] § 651…and [Pen. Code,] § 1119…."].)

The trial court in this case likely erred by visiting the crime scene on an ex parte basis. This does not mean, however, that appellants suffered prejudice. McDonald's arguments rely almost exclusively on the *Jackson* opinion, but his briefs fail to mention that the magistrate's error in that case was found to be harmless. (*Jackson*, *supra*, 218 Cal.App.3d at p. 1506.) The harmless error analysis took into account that there was no indication the magistrate's conduct affected the trial judge's deliberations on the issue of guilt or otherwise deprived the defendants of a fair trial. "Indeed, the accuracy of the magistrate's improper observation was confirmed by the witnesses' testimony as to the rural and isolated nature of the terrain. The magistrate's description of his own observations was apparently not subject to factual dispute, was essentially neutral and was thus not prejudicial." (*Ibid.*)

While arguing for a mistrial, McDonald's trial counsel conceded that his motion was essentially based on a "technical" error insofar as the court's observations were connected to the finding that the Willows was a dangerous place. The trial court pointed out that the defendants had taken the position that the apartment complex *was* dangerous, and did so to justify arming themselves with guns. Defense counsel agreed, responding, "No question about it. No question about it." The court added, "If anything, I reaffirmed

their position." McDonald's attorney replied, "That is correct, and we'll be addressing that, I'm sure, in the jury instructions." As represented, McDonald did ask the jury to find that the Willows was "a dangerous place" to support a theory of involuntary manslaughter on the argument that he had armed himself for protection and killed the victim as a result of criminal negligence.

The trial court's finding regarding the dangerousness of the Willows pertained to the nature and character of the complex at the time of trial in May 2011, not at the time of the shooting in November 2008. As such, it was relevant only to the section 1119 motion and had no perceivable impact on any other aspect of the case. Given defendants' opposition to the motion, it would seem that the court's irregular conduct inured to their benefit. Moreover, as in *Jackson*, the trial court's observations were not subject to factual dispute, as multiple witnesses had described the complex as a dangerous place.

Furthermore, the challenged behavior did not occur in front of the jury, and appellants have not shown that the court's findings had an effect on the jury's verdict. The argument that appellants' constitutional right to a fair trial was compromised is simply not supported by the record. We therefore conclude that the trial court's error was harmless under any standard of prejudice.

**Sufficiency of Evidence Corroborating the Accomplice Testimony Against Johnson**

Johnson contends that his conviction must be reversed because there was insufficient evidence, apart from accomplice testimony by the Scott brothers and Justin McCowan, to connect him to the commission of the offense. We disagree.

California law precludes a conviction based on accomplice testimony "unless it [is] corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) The corroborating evidence "'may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense'" so long as it "'tends to connect the

49.

defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) Such evidence may be "of little weight by itself, and related merely to one part of the accomplice's testimony." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 186.)

"The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 986.) We must view the evidence in the light most favorable to the verdict and uphold the conviction if, on the basis of the evidence presented, the jury's determination is reasonable. (*People v. Garrison* (1989) 47 Cal.3d 746, 774.)

The accomplice testimony in this case identified Johnson as one of six people involved in the shooting at the Willows, all of whom were young African-American males and purported members of the Westside Crips street gang. The accomplices alleged Johnson aided and abetted the crime by driving their group to the Willows in Doreen Montiel's van, furnishing at least one of the firearms that were used in the offense, and encouraging those with guns to shoot at rival gang members. Independent eyewitness testimony indicated that six young African-American males were involved in the shooting and fled the scene in a van. Doreen Montiel's testimony that she specifically loaned her van to Johnson on the night of the incident provided further corroboration of his alleged participation in the crime. With four of the six individuals admitting their own presence at the scene, and overwhelming evidence identifying McDonald as the fifth perpetrator, there was sufficient circumstantial evidence from which the jury could conclude that the accomplices had truthfully identified Johnson as the sixth member of the group. Although more attenuated, the cell phone data further corroborated the accomplices' story, particularly with respect to the last phone call to Johnson which allegedly prompted the group to head northbound to the apartment complex.

Evidence of Johnson's gang membership also supported the accomplices' testimony. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1178 (*Samaniego*) ["Gang membership can be a significant factor in corroborating an accomplice's testimony."].) The California Supreme Court's opinion in *People v. Szeto* (1981) 29 Cal.3d 20 (*Szeto*) demonstrates how gang ties can be corroborative. In *Szeto*, members of an Asian street gang fired guns into a restaurant where rival gang members were believed to be eating, killing several bystanders in the process. (*Szeto*, *supra*, 29 Cal.3d at p. 26.) The defendant was convicted as an accessory for his role in disposing of the weapons. (*Ibid.*) An accomplice testified that on the morning after the shooting, the defendant brought the gunmen food, took possession of their firearms, and dumped the guns into the San Francisco Bay. (*Id*. at p. 27.) The California Supreme Court held that the accomplice's testimony was corroborated by independent evidence which showed (1) the defendant was a member of the "Joe Boys" gang; (2) the Joe Boys had a violent rivalry with two gangs whose members were the intended targets of the shooting; (3) on the morning after the shooting, the defendant brought food to the house where the gunmen were staying; and (4) the guns used in the crime were inside the house when the defendant delivered the food. (*Id*. at p. 28.) The evidence was sufficiently corroborative because it showed the defendant had a motive and opportunity to aid his fellow gang members.

Here, evidence of Johnson's role as the driver on the night of the offense, his membership in the Westside Crips, a special connection to the shooter (McDonald) within the gang's hierarchy, and his gang's rivalry with the intended target of the shooting (i.e., Eastside Crip gang members), established a clear motive and opportunity to aid and abet the crime. (*Szeto*, *supra*, 29 Cal.3d at p. 28; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1178 [evidence of motive and opportunity to participate in gang-related shooting corroborated accomplice testimony]; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1013, 1023 [same].) Taken as a whole and considered in the light most favorable

51.

the evidence we have discussed had sufficient weight and probative value to connect Johnson to the crime. Therefore, the accomplice testimony was adequately corroborated.[7]

**Prosecutorial Misconduct and Ineffective Assistance of Counsel**

Johnson claims he received constitutionally deficient representation as a result of his trial attorney's failure to object to alleged instances of prosecutorial misconduct during closing argument. It is clear from the record that Johnson cannot establish prejudice on the basis of the prosecutor's remarks. We therefore reject his claim without deciding whether prosecutorial misconduct actually occurred or whether his attorney's performance fell below an objective standard of reasonableness.

---

[7] Shortly after this matter was submitted, the Second District Court of Appeal filed its opinion in *People v. Pedroza* (Nov. 14, 2014, B247666) _ Cal.App.4th_ [2014 Cal.App. LEXIS 1038] (*Pedroza*), which affirmed the post-verdict dismissal of a murder case for lack of sufficient evidence to corroborate accomplice testimony as required by section 1111. Johnson has since asked that we factor the *Pedroza* decision into our analysis, arguing that its holding compels reversal of his conviction. We have reviewed the *Pedroza* opinion, and conclude that the present case is materially distinguishable.

In *Pedroza*, the victim was killed by one or more members of his own gang. (*Pedroza*, *supra*, _ Cal.App.4th_ [2014 Cal.App. LEXIS 1038, pp. 2-4.) Apart from the defendant's common membership in the gang (which was estimated to include over 400 people), the only evidence to corroborate the accusations of his alleged accomplice was eyewitness testimony which placed him in the same location as the accomplice and other gang members approximately three or four hours after the crime was committed. (*Id*. at pp. 2-4, 28.) The Second District concluded there was insufficient evidence to connect the defendant to the actual commission of the crime, noting that the underlying circumstances were distinguishable from those in cases such as *Szeto*, *supra*, and *Vu*, *supra*, because there was no analogous indication of a motive nor "independent evidence regarding defendant's whereabouts before or during the time of the shooting that would indicate he had the opportunity to commit the murder…." (*Pedroza, supra,* at pp. 36-40.) Here, independent evidence showed that Johnson had both a motive and the opportunity to aid and abet his fellow gang members in their commission of the offense.

Background

During closing argument, the prosecution urged the jury to reject any theories of self-defense or involuntary manslaughter because the evidence showed that the defendants were the initial aggressors in the shooting. Johnson takes issue with three statements made in conjunction with this message. First, the prosecution argued imperfect self-defense was not available because "[Defendants committed] a very aggressive act to go into enemy territory with a weapon. [Voluntary and involuntary manslaughter are] not available if you are the aggressor. You just don't get there." Next, the jury was told, "You have a 15-year-old member of a gang who arms himself with a handgun, goes to a location where he's expecting to find members of the Eastside Crips, a rival gang, presents himself there, puts himself in a situation where he may or may not have a right to defend himself. That minor in possession of a firearm under those circumstances is not a crime within [] involuntary manslaughter." Finally, towards the end of the argument, the prosecution said, "They enter[ed] the Willows with no right to self-protection. No right as an aggressor to invoke the right of imperfect self-defense for voluntary manslaughter."

Relying on a case from the 19th century entitled *People v. Conkling* (1896) 111 Cal. 616 (*Conkling*), Johnson argues the prosecutor misstated the law by suggesting that entering into "enemy territory" with a weapon necessarily eliminated the predicate elements of imperfect self-defense and/or involuntary manslaughter. In *Conkling*, the defendant was involved in a dispute concerning the use of a road over the victim's property. The defendant armed himself with a rifle, tore down a fence the victim had erected to block the road, and used the road to travel into town. The victim was waiting for the defendant on his return trip home. An argument ensued, which resulted in the defendant shooting the victim. Among other grounds for reversal, the California Supreme Court identified an instructional error which could have misled the jury to believe the defendant lost his right to self-defense by merely removing the fence and

53.

using the disputed road, even if the victim had been the initial aggressor. (*Conkling*, *supra*, 111 Cal. at pp. 619-621, 624-625.)

According to Johnson, his trial attorney should have realized that the prosecutor's arguments were inconsistent with the *Conkling* opinion, and interposed an objection on those grounds. Failure to do so, he argues, amounted to ineffective assistance of counsel. He further submits that his attorney's failure to object allowed the jury to be misled as to the applicable law, thereby causing them to reject imperfect self-defense and involuntary manslaughter without giving proper consideration to the evidence under the controlling legal standards.

Analysis

"'To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury.' [Citation.] There are two exceptions to this forfeiture: (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Neither exception applies here. Recognizing that the prosecutorial misconduct argument has been forfeited, Johnson styles his claim as one of ineffective assistance of counsel.

An appellant must establish two things in order to prevail on an ineffective assistance of counsel claim: (1) the performance of his or her attorney fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697; accord, *People v. Boyette, supra,* 29 Cal.4th at pp. 430-431.) Johnson's claim is most easily disposed of under the second prong of the *Strickland* analysis.

To the extent the prosecutor's summary of law may have been inaccurate or misleading, the fact remains that the jury was instructed on general principles of provocation, self-defense, voluntary manslaughter, and involuntary manslaughter pursuant to CALCRIM Nos. 522, 505, 570, 571, and 580, respectively. The jury also received a number of specially prepared instructions covering death as the result of an accident, imperfect self-defense, and involuntary manslaughter. In addition, the trial court admonished the jury using the following language from CALCRIM No. 200: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

Jurors are presumed to be intelligent persons "'""capable of understanding and correlating all jury instructions which are given."'"" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) In the absence of an affirmative showing to the contrary, which Johnson has not made, we must presume the jury followed the trial court's instructions and disregarded any incorrect statements of law by the prosecutor that conflicted with those instructions. (*People v. Anzalone* (2013) 56 Cal.4th 545, 557; *People v. Osband* (1996) 13 Cal.4th 622, 717; see *Weeks v. Angelone* (2000) 528 U.S. 225, 234 ["A jury is presumed to follow its instructions."].) There is no basis upon which to conclude that the outcome of the case was affected by defense counsel's failure to object to the prosecutor's remarks.

Our conclusion is reinforced by the unlikelihood that the jury's verdict would have been different had the challenged remarks not been made. Imperfect self-defense requires an actual belief in the need to defend oneself based on a fear of imminent danger to life or great bodily injury. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) "'Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice.'" (*Ibid*.) The undisputed evidence showed McDonald shot the victim on sight and without provocation. Even if he was startled by the victim's

sudden presence, there was no evidence of any conduct by the victim which could have led him to instantaneously believe he was in imminent danger of death or great bodily injury.

The defense theory for involuntary manslaughter rested upon the notion that McDonald discharged the gun by accident. This was a weak argument given the evidence that he fired two shots from the .22-caliber pistol. In any event, the jury's true finding on the enhancement allegation under section 12022.53, subdivision (d) confirms its conclusion that McDonald *intentionally* discharged the firearm. Therefore, any argument that the jurors would have returned a verdict of involuntary manslaughter but for defense counsel's failure to make objections during closing argument is without merit.

**Jury Instructions**

CALCRIM No. 580

The jury was instructed on involuntary manslaughter with a modified version of CALCRIM No. 580, which was prepared by defense counsel. Johnson contends that the modified instruction was deeply flawed such that the jury likely concluded it could not consider involuntary manslaughter as "a meaningful, viable option" even if it believed the shooting happened by accident. Dean and McDonald join in this argument. Respondent asserts that the claim is barred by the doctrine of invited error, and alternatively argues that the instruction was appropriate as given. We need not resolve these debates, as it cannot be shown that the defendants suffered prejudice.

Involuntary manslaughter is a lesser included offense of murder. (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) The crime is defined as an unlawful killing which occurs "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) "Through statutory definition and judicial development, there are three types of acts that can underlie commission of involuntary

56.

manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.)  The required mental state for all three types of predicate acts is criminal negligence.  (*Ibid*.)

Appellants' trial counsel was asked to customize the jury instruction on involuntary manslaughter to reflect whatever predicate acts the defense believed were applicable.  When the topic arose during a jury instruction conference, the trial court commented, "I don't know if you're claiming a [Penal Code section] 417, which is, I think, displaying a weapon in an offensive manner.  I just don't know what the [applicable] crime that you had in mind is."  McDonald's attorney subsequently prepared a modified version of CALCRIM No. 580 using "minor in possession of a firearm" as the predicate offense (§§ 29610, 29700).  The instruction included an alternative theory regarding the use of a firearm as a lawful act committed with criminal negligence, which the trial court allowed in light of defense counsel's argument that if a gun was used in self-defense, such use constituted a lawful act.

The prosecution opined that the evidence did not warrant any instructions on involuntary manslaughter.  Dean and Johnson endorsed the version of CALCRIM No. 580 prepared by McDonald's attorney, which was ultimately given to the jury.  On appeal, however, Johnson contends that the involuntary manslaughter instruction should have used the offense of brandishing a firearm as the predicate misdemeanor (§ 417, subd. (b)), without any references to a minor in possession of a firearm or statements characterizing the use of a firearm as a lawful act.  He surmises that the jury concluded there was no causal connection between mere possession of a firearm and a shooting fatality, and likewise rejected the idea that discharging a firearm with criminal negligence is a lawful act.  Thus, he argues, it is reasonably likely that the jury rejected the possibility of involuntary manslaughter despite believing the victim's death was caused by the accidental discharge of McDonald's weapon.

The trial court has a sua sponte duty to instruct on general principles of law relevant to the issues raised by the evidence, which includes giving instructions on lesser included offenses. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) However, "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*Id*. at pp. 1085-1086 [failure to instruct as to manslaughter harmless given jury's true finding as to felony-murder special circumstance]; accord, *People v. Beames* (2007) 40 Cal.4th 907, 928; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) """"In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury.""" (*People v. Elliot* (2005) 37 Cal.4th 453, 475.)

An involuntary manslaughter theory based on the brandishing of a firearm is cognizable only if the defendant accidentally discharged the weapon. (*People v. Thomas* (2012) 53 Cal.4th 771, 814-815 (*Thomas*) [affirming second degree murder conviction and concluding failure to instruct on a brandishing theory of involuntary manslaughter was harmless error].) As previously noted, the jury's true finding on the section 12022.53, subdivision (d) enhancement establishes its conclusion that McDonald caused the victim's death by personally and *intentionally* discharging a firearm. In other words, the jury necessarily rejected defendants' argument that the shooting was accidental. Therefore, any error in failing to instruct on a brandishing theory of involuntary manslaughter was harmless.

CALCRIM No. 400

Prior to 2010, CALCRIM No. 400, defining the general principles of aiding and abetting, advised that a person is "equally guilty" of a crime whether he or she committed the crime personally or aided and abetted the perpetrator. (*Samaniego*, *supra*, 172

58.

Cal.App.4th at p. 1165, citing former CALCRIM No. 400 (2009 rev.).) The "equally guilty" language has since been removed from the instruction. (See CALCRIM No. 400 ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."].) Although the proceedings below were conducted in 2011, the jury was instructed pursuant to an outdated version of CALCRIM No. 400. Dean and Johnson thus allege instructional error based on the "equally guilty" language that was used in the trial court's explanation of the law concerning accomplice liability.[8]

Appellants did not object to, or request modification or clarification of, the instruction they now challenge. This failure to act should be fatal to their claim since there are several published opinions which hold that a challenge to the "equally guilty" language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial. (E.g., *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [addressing challenge to the "equally guilty" language in CALJIC No. 3.00]; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 (*Lopez*); *Samaniego*, *supra*, 172 Cal.App.4th at p. 1163.) Appellants ask us to ignore this precedent, arguing the alleged error impinged upon their substantial rights. Forfeiture aside, we find the alleged error to be harmless under any standard of prejudice.

The challenged version of CALCRIM No. 400 did not contain an incorrect statement of law. "All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433; accord, § 31 ["All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, ... are principals in any crime so committed."].) Nevertheless, a number of appellate decisions

---

[8] The relevant text of the instruction read: "A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator."

hold that under extraordinary circumstances, the aider and abettor may have a mental state which reflects a lesser level of culpability than that of the direct perpetrator. (See, e.g., *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1164-1165 ["while generally correct in all but the most exceptional circumstances, [CALCRIM No. 400] is misleading here and should have been modified."].)

According to the California Supreme Court, it is possible for an aider and abettor to be convicted of a crime *greater* than the offense for which the actual perpetrator is liable. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118-1119, 1122). In light of this holding, appellate courts have reasoned that the opposite must be true, i.e., an aider and abettor can theoretically be convicted of a lesser crime than the offense for which the actual perpetrator is liable. (*Lopez*, *supra*, 198 Cal.App.4th at p. 1118; *People v. Nero* (2010) 181 Cal.App.4th 504, 513-518 (*Nero*); *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1163-1164.) Given these possible outcomes, the "equally guilty" language is potentially misleading insofar as it suggests that the direct perpetrator and the aider and abettor must be found guilty, if at all, of the same crime(s) and degree(s) thereof. However, reversible error stemming from the use of this language has only been found in cases where jurors informed the trial court that they were confused by the instruction, and the court failed to provide adequate clarification in response to their inquiries on the subject. (*People v. Loza* (2012) 207 Cal.App.4th 332, 352-355 (*Loza*); *Nero*, *supra*, 181 Cal.App.4th at pp. 517-520.)

We do not presume a jury has been misled by an erroneous instruction. To the contrary, "[a] defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68 (*Cross*).) Otherwise, we adhere to the presumption that jurors are "able to understand and correlate instructions," and follow the instructions that they are given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) This presumption was rebutted

in *Loza* and *Nero*, *supra*, through evidence which clearly showed that the jurors were confused as to what mental state was required to establish aider and abettor liability. (*Loza*, *supra*, 207 Cal.App.4th at p. 355 ["the questions this jury asked indicated that despite having been provided instructions from which they should have understood that they were required to consider the intent of the person accused of aiding and abetting the perpetrator, the jury remained confused as to this issue."]; *Nero*, *supra*, 181 Cal.App.4th at p. 518 ["where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is "yes," she can be. The trial court, however, by twice rereading CALJIC No. 3.00 [containing the 'equally guilty' language] in response to the jury's question, misinstructed the jury."].) Here, in contrast, the record is devoid of any indication that the jury was confused by the aiding and abetting instructions.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) A jury instruction is not judged in artificial isolation, but rather from the entire charge of the court and the overall trial record. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1330-1331.) In this case, the instruction given under CALCRIM No. 400 was immediately followed by a more detailed explanation of the required mens rea for aiding and abetting liability as set forth in CALCRIM No. 401:

> To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

61.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all of these requirements are proved, the defendant does not need to have actually been present when the crime was committed to be guilty as an aider and abettor.

If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed….

Considering that the jury was properly instructed under CALCRIM No. 401 and expressed no confusion regarding the "equally guilty" language in CALCRIM No. 400, we are not persuaded that a miscarriage of justice occurred through the use of the latter instruction. (See *Lopez*, *supra*, 198 Cal.App.4th at pp. 1119-1120 [any error in CALCRIM No. 400's "equally guilty" language harmless where jury was also instructed with CALCRIM No. 401].) The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the inclusion of the phrase "equally guilty" in CALCRIM No. 400 did not constitute reversible error.

CALCRIM No. 1401

McDonald contends that the trial court erred by failing to provide the jury with a definition of the phrase "in association with a criminal street gang" as used in CALCRIM No. 1401. Dean and Johnson join in this claim. We note McDonald's trial attorney

asked that the words "or in association with" be deleted from the instruction entirely, but did so for reasons unrelated to the arguments now raised on appeal. None of the parties requested a clarifying instruction for this phrase.

The jury was instructed on the section 186.22, subdivision (b)(1) gang enhancement with the following language pursuant to CALCRIM No. 1401: "To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, *or in association with a criminal street gang*; [¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members…." (Italics added.) Appellants argue that the trial court had a sua sponte duty to explain the meaning of the italicized language with a clarifying instruction. The contention is based on their interpretation of the California Supreme Court's opinion in *People v. Albillar* (2010) 51 Cal.4th 47 (*Albillar*), which they believe stands for the proposition that "the phrase 'in association with a criminal street gang' is a legal term with a specific definition that needed to be provided to the jury." As we will explain, the *Albillar* opinion contains no such holding. Thus, assuming the issue has not been forfeited by appellants' failure to raise a proper objection or request a clarifying instruction, we reject their claim on the merits.

The language in CALCRIM No. 1401 comes directly from the text of section 186.22. The statute provides, in pertinent part, for the imposition of an enhanced sentence upon "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang…." (§ 186.22, subd. (b)(1).) "'If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning.'" (*People v. Lucas* (2014) 60 Cal.4th 153, 296, quoting *People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547.)

In *Albillar*, *supra*, three defendants challenged the sufficiency of evidence supporting a jury's finding that their forcible rape of a 15-year-old girl was committed in

association with a criminal street gang for purposes of section 186.22. An introductory sentence preceding several paragraphs of legal analysis in the majority opinion states: "The record supported a finding that defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against [the victim]." (*Albillar*, *supra*, 51 Cal.4th at p. 60.) The jury's findings were affirmed based on the majority's determination that the evidence showed defendants were members of the same criminal street gang and acted in concert with the requisite criminal intent. In other words, the defendants "came together *as gang members* to attack [the victim] and, thus, they committed these crimes in association with the gang." (*Id*. at pp. 61-62, original italics).

In a partial dissent, Justice Werdegar disagreed with the majority's conclusion on this issue and argued that the statute should be interpreted as requiring a connection between the charged conduct and the defendants' gang "as an organization," rather a mere showing that defendants committed a felony "in association with *members* of a criminal street gang." (*Albillar*, *supra*, 51 Cal.4th at pp. 72-73 (conc. & dis. opn. of Werdegar, J.), original italics.) The dissent further opined that the majority had fashioned a new definition of the phrase "in association with a criminal street gang," by stating that the defendants had "relied on their common gang membership and the apparatus of the gang." (*Id*. at p. 73.)

Appellants' arguments are clearly derived from Justice Werdegar's analysis, but the views expressed in her dissenting opinion do not constitute the holding in *Albillar*. No instructional issues were raised in that appeal, and the majority opinion does not purport to assign a unique or technical definition to the phrase "in association with any criminal street gang," or recognize a sua sponte duty on the part of trial courts to explain its meaning to jurors. Therefore, given the absence of a request for a clarifying instruction, the trial court in this case did not err by failing to explain the phrase to the jury.

CALCRIM No. 1402

Dean seeks reversal of the jury's true finding on the section 12022.53 firearm enhancement based on an alleged instructional error involving CALCRIM No. 1402. Johnson joins in his arguments. The instruction given to the jury was as follows [we have italicized the challenged language]:

> If you find the defendant guilty of the crimes charged in Counts 1 and/or 2, and you find that the defendant committed said crime and/or crimes for the benefit of, at the direction of, or in association with a criminal street gang, with the intent to promote, further, or assist in any criminal conduct by gang members, you must then decide whether for each crime the People have proved the additional allegation that one of the principals personally used and personally and intentionally discharged a firearm during the commission of that crime and caused death. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.
>
> To prove this allegation, the People must prove that:
>
> 1. Someone who was a principal in the crime personally discharged a firearm during the commission of the crime;
>
> AND
>
> 2. That person intended to discharge the firearm;
>
> AND
>
> [3.] That person's act caused the death of another person.
>
> A person is a principal in a crime if he or she directly commits or attempts to commit the crime or if he or she aids and abets someone else who commits or attempts to commit the crime. [¶] A firearm is any device designed to be used as a weapon from which a projectile is discharged or

expelled through a barrel by the force of an explosion or other form of combustion.

*A principal personally uses a firearm if he or she intentionally does any of the following:*

> 1. *Displays the firearm in a menacing manner;*
>
> 2. *Hits someone with the firearm;*
>
> *OR*
>
> 3. *Fires the firearm.*

*An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.*

The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

Dean submits that the definition of "personal use" should not have been included in the instruction because the prosecution's theory of liability was based on the intentional discharge of a firearm with proximate causation of death. He further contends that the definition of proximate cause should have been omitted because "[t]here was no question that it was [McDonald] who fired the shot from the .22 caliber gun that killed Camberos and therefore causation was not at issue." It is true that the Bench Notes to CALCRIM No. 1402 indicate that the portion of the instruction regarding personal use should not be given "if the prosecution alleges intentional discharge or intentional discharge causing great bodily injury or death." (Bench Note to CALCRIM No. 1402

(2014 ed.) p. 1048.) However, with regard to Dean's second contention, the Bench Notes also state that the trial court has a sua sponte duty to instruct on proximate cause if causation is at issue. (*Ibid.*) Appellants have not identified any part of the record which shows that they stipulated to the issue of causation at trial.

"[G]iving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."'" (*Cross*, *supra*, 45 Cal.4th at p. 67.) Such mistakes are reviewed under the *Watson* standard for harmless error. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130.) We "affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on [an unsupported instruction]." (*Ibid.*)

Dean argues that the jury was likely misled to believe he was liable under section 12022.53 for merely discharging his own gun into the air, thereby lowering the prosecution's burden of proof. He overlooks the fact that the firearm enhancement was found true as to him (and Johnson) pursuant to section 12022.53, subdivisions (d) and (e)(1), the latter of which imposes vicarious liability upon an aider and abettor for the actions of a fellow gang member whose personal and intentional discharge of a firearm proximately causes great bodily injury or death. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171 ["Section 12022.53, subdivision (e)(1), imposes vicarious liability under this section on aiders and abettors who commit crimes in participation of a criminal street gang."].) McDonald was found to have committed the requisite conduct pursuant to section 12022.53, subdivision (d), and there is ample evidence in the record to support this finding. Dean and Johnson were vicariously liable for his actions. Hence, there is no likelihood that the section 12022.53 enhancements against Dean and Johnson would have been rejected by the jury but for the trial court's failure to remove the language regarding personal use and causation from the CALCRIM No. 1402 instruction.

**Cumulative Error**

Appellants claim the errors they have alleged cumulatively amounted to reversible error. To the extent there are instances in which we have found error or assumed its existence, no prejudice resulted. We reach the same conclusion after considering the cumulative effect of such actual and assumed errors.

**Cruel and Unusual Punishment**

McDonald contends that the indeterminate sentence of 40 years to life in prison is a "de facto" sentence of life without parole, which, given his young age at the time of the offense, violates the constitutional guarantee against cruel and unusual punishment. Johnson joins in his claim. We reject their arguments.

""""The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's 'personal responsibility and moral guilt.' [Citations.] Article I, section 17 of the California Constitution separately and independently lays down the same prohibition.'" [Citations.] To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including … age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ""shocks the conscience and offends fundamental notions of human dignity"" [citation], the court must invalidate the sentence as unconstitutional." (*People v. Lucero* (2000) 23 Cal.4th 692, 739-740.)

We begin our analysis by considering the nature of the underlying offense. "There can be no dispute that murder is a serious crime, and … the use of a gun by a gang

member in the commission of a crime present[s] a significant degree of danger to society." (*People v. Em* (2009) 171 Cal.App.4th 964, 972 (*Em*).) Our Legislature has resolved to impose severe punishments upon armed gang members who commit serious crimes and those who aid and abet them. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 19 (*Gonzales*).)

A prison term falling within the Legislature's sentencing guidelines is considered cruel and unusual in only the rarest of circumstances. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.) The facts of this case do not present such a scenario. David Camberos was apparently targeted at random and killed for no reason other than defendants' belief that he might have been affiliated with a rival street gang. There are no mitigating factors to be found within the surrounding circumstances of the offense. McDonald killed an innocent and defenseless young man, and Johnson may fairly be characterized as the instigator of the crime. "Life sentences pass constitutional muster for those convicted of aiding and abetting murder." (*Em*, *supra*, 171 Cal.App.4th at p. 972-973.)

While appellants' ages are important, sentences in the range imposed against Johnson and McDonald have been upheld on numerous occasions. (See, e.g., *Em*, *supra*, 171 Cal.App.4th at p. 976 [50-years-to-life sentence imposed on immature 15-year-old convicted of first degree felony-murder as an aider and abettor not disproportionate when balanced against seriousness of crime, defendant's participation in crime and gang affiliation, and danger defendant presented to society]; *Gonzales*, *supra*, 87 Cal.App.4th 1, 16-17 [50-years-to-life sentence imposed on 16 year olds who aided and abetted a murder not cruel and unusual punishment]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1230-1231 [upholding sentence of 40 years to life for 17-year-old gang member who committed attempted murder with a firearm].) We reject their argument that an indeterminate term of 40 years to life in prison is the functional equivalent of a life sentence without the possibility of parole. With the recent enactment of section 3051,

both will be eligible for release on parole during their 25th year of incarceration. (§ 3051, subd. (b)(3).)

At the time of sentencing (12/20/2011), McDonald's age was 18 years and six months. He received credit for time served of 1,099 days. Notwithstanding the provisions of section 3051, his eligibility for parole after 40 years in custody means that he could be free by the age of 55. Johnson was about one month shy of his 21st birthday at the time of sentencing, so with the same amount of presentence custody credit, he will have served 40 years by the time he is 58 years old. These sentences do not violate the constitutional prohibition against cruel and unusual punishment.

## **DISPOSITION**

The judgments are affirmed.


_____

Gomes, J.

WE CONCUR:


_____

Cornell, Acting P.J.


_____

Oliver, J.

70.